UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

DEYONTA R. ROBINSON,

     Petitioner,       Case No. 1:08-cv-291

v.               Honorable Paul L. Maloney

SHIRLEY A. HARRY,

     Respondent.
_____/

## REPORT AND RECOMMENDATION

    This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254.  Petitioner Deyonta R. Robinson was convicted in the Muskegon County Circuit Court of

one count of armed robbery, MICH. COMP. LAWS § 750.529, and three counts of unarmed robbery,

MICH. COMP. LAWS § 750.530.  On August 19, 2002, the trial court sentenced Petitioner, as a third-

felony offender, MICH. COMP. LAWS § 769.11, to prison terms of 27 to 41 years for the armed

robbery conviction and 20 to 30 years for each of the unarmed robbery convictions.  In his *pro se*

petition, Petitioner raises nine grounds for relief, as follows:

   I.   The trial was fundamentally unfair in violation of Petitioner's 14[th]
      Amendment right to due process and Petitioner's 6[th] [A]mendment right to
      fair notice.  The errors claimed as ambush in Ground Three, variance in
      Ground Four, unanimous verdict in Ground Five, and inconsistent theories
      in Ground Six all focus on lack of due process and fair notice.  The impact
      of these errors, considered together, caused the fundamentally unfair trial and
      the resulting denial of constitutional fair notice and due process.  The errors
      claimed in [G]rounds [T]wo and [S]even involve due process violations.
      There was ineffective trial counsel because of an ambush and ineffective
      appellate counsel because of the failure to raise preserved errors and to

effectively present the serious violations of [P]etitioner's 14th and 6th [A]mendment rights.

II.     The fact that the trial judge allowed, over defense counsel's objections, the prosecutor's frequent references, questions and arguments, to the co-defendant's separate trial caused violation of [Petitioner's] constitutional rights. The rulings caused a fundamentally unfair trial, in essence informing the jury that a non-testifying co-defendant had been found guilty, which was a violation of [Petitioner's] rights of due process and confrontation as guaranteed by the 14th and 6th [A]mendments.

III     Petitioner's [c]onstitutional rights, 6[th] and 14th Amendment rights to fair notice, due process, and effective trial counsel were violated, denying [Petitioner] a fair trial by (1) an "ambush" - the late trial variances changing the charges from his being a principal in an armed robbery with a gun to being an aider and abettor of Karl McBride because Karl had a broken bottle in his hand; (2) the aiding and abetting instruction, which should not have been given, and which was a part of the ambush; (3) the trial judge's erroneous armed robbery instruction giving three alternatives when only one was applicable, which added more to the ambush; and (4) the trial judge's erroneous supplemental instructions in response to the jury's questions, which was the final factor in the ambush.

IV.     The [Petitioner] was denied his constitutional rights pursuant to the 6th and 14th [A]mendments, to due process, and fair notice, by the fatal variance between the information, which specified robbery with a gun, and the jury instructions, which permitted conviction for robbery with a bottle. To the extent that counsel failed to sufficiently present or preserve this issue for review, [Petitioner] was denied effective trial counsel.

V.      Petitioner was denied his 14th Amendment right to due process because he was denied his state [c]onstitutional right to a unanimous verdict on every element of the offenses charged. To the extent that trial counsel failed to sufficiently present or preserve the issue for review, [P]etitioner was denied the effective assistance of counsel. To the extent that appellate counsel failed to preserve this issue for habeas corpus review, [P]etitioner was denied effective assistance of appellate counsel.

VI.     Petitioner's 6[th] and 14th Amendment constitutional rights to fair notice, due process, and effective trial counsel, were violated, denying [Petitioner] a fair trial by the fact that the same prosecutor used inconsistent theories in convicting the [Petitioner] and co-defendant[] Karl McBride in separate jury trials.

VII.     [Petitioner] was denied due process of law contrary to the 14th Amendment, United States Constitution and Michigan Constitution, Article 1, sec. 17 because the prosecutor was guilty of prosecutorial misconduct.

VIII.    Petitioner's 14th Amendment due process rights and his constitutional rights under the [C]onfrontation [C]lause of the 6th Amendment were violated at sentencing by (1) the assessment of 50 points for excessive brutality based upon an alleged kick not in the record at either trial or sentencing, (2) assessment of 25 points based upon erroneous application of state law, and (3) arbitrarily adding 2 years for no apparent reason.

IX.      The Michigan indeterminate sentencing procedures violate the [Petitioner's] constitutional rights under the United State Constitution, 6th Amendment, to have the facts that bear on his sentence determined by a jury rather than a judge.

(Pet., Page ID ## 14-15, 17, 19-20, 22-24, 26, 28, 30, docket #1.)  Respondent has filed an answer to the petition (docket #7) stating that the grounds should be denied because they are either procedurally defaulted, noncognizable or without merit.  Upon review and applying the AEDPA standards, I find that Petitioner's habeas grounds are without merit.  Accordingly, I recommend that the petition be denied.

I.     Proposed Findings of Fact

A.     Muskegon County Circuit Court Proceedings

Petitioner was charged with four counts of armed robbery and four counts of possessing a firearm during the commission of a felony (felony firearm).  Following a preliminary examination on December 18, 2001, Petitioner was bound over for trial on all counts.  (Prelim. Hr'g Tr., docket #11.)  Petitioner was tried before a jury beginning May 7, 2002, and concluding May 13, 2002.[1]

---

[1]The trial transcripts will be referred to as follows:
Tr. I     Jury Trial Volume I, May 7, 2002, docket #15
Tr. II    Jury Trial Volume II, May 8, 2002, docket #17
Tr. III   Jury Trial Volume III, May 9, 2002, docket #18

The incident underlying Petitioner's convictions occurred on September 12, 2000, at the home of Eric Reed in Muskegon, Michigan. Reed testified that, on the night of September 12, 2000, he was shooting dice with James Hardy, Henry Salazar (a.k.a. Worm), Petitioner, Karl McBride, J.D. Rice and one other person. (Tr. I at 157-58.) According to Reed, McBride placed and lost only one $10.00 bet, while Petitioner played for about 20 minutes and lost about $30.00 or $40.00. Petitioner and McBride stopped playing and began running in and out of the house and whispering to each other. (Tr. I at 160-61.) Reed was in the next room, his bedroom, and heard a bottle break. He came back into the room where the gambling was taking place and saw McBride standing over Hardy with a broken beer bottle in his hand. (Tr. I at 161.) Hardy was curled up on the floor, bleeding and trying to cover his face. Petitioner then pulled out a gun and said, "Everybody drop their money." (Tr. I at 163.) Reed described the gun in Petitioner's hand as a pistol or a handgun. (Tr. I at 164.) Reed threw about $250 on the floor and McBride picked it up. (Tr. I at 165.) Reed testified that Petitioner made sure that he had everyone's money and then left through the front door. (Tr. I at 166.) Reed also testified that no money was ever returned by Petitioner. He stated that he did not hear Hardy make statements about trying to get McBride's and Petitioner's money and that he did not see or hear anything about an extra red die. (Tr. III at 599-600.)

James Hardy also testified that he was playing dice at Eric Reed's house on the night of September 12, 2000. (Tr. II at 217.) Hardy got up from shooting dice to go to the bathroom. When he returned to the game, McBride hit him on the head with a beer bottle. (Tr. II at 219-220.) After being hit with a beer bottle, Hardy heard Petitioner say: "Everybody lay down. This is a

robbery." (Tr. II at 222.)  Hardy did not see a gun, but he was bleeding so heavily that he did not see much of anything after being hit.  (Tr. II at 235, 243-44.)

Henry Salazar reluctantly testified pursuant to a subpoena.  (Tr. II at 249, 255.) Salazar stated that he came to Reed's house the night of the incident.  The robbery occurred approximately five minutes after Salazar arrived.  (Tr. II at 250.)  Salazar saw McBride hit Hardy over the head with a bottle.  Petitioner then pulled a gun, and Salazar heard him say, "Everybody drop their money."  Salazar had more than $100.00 with him, and he dropped the money on the floor.  (Tr. II at 251-52.)  He testified that he did not see who picked up the money.  (Tr. II at 253.) According to Salazar, his money was never returned.  (Tr. II at 258.)

J.D. Rice elaborated on the details of the robbery.   Rice, Hardy, Henry Bridges (a.k.a. Easky or Ski) and Reed were gambling. Petitioner and McBride arrived after about thirty minutes.  (Tr. II at 276.)   As the others were gambling, Petitioner and McBride kept whispering walking in and out of the house.  Hardy was sitting on a stool when McBride came up and hit Hardy in the head with a 22-ounce bottle of beer.  Then Petitioner walked up and said "This is a stickup and everybody lay down.  This is for real.  Everybody lay down." (Tr. II at 278.)  Rice testified that Petitioner was holding a black automatic handgun.  (*Id.*)  After Rice laid down, Petitioner came over to him, put the pistol to his head, and told him to "[g]et up and empty your pockets."  (Tr. II at 279.) Petitioner told McBride to come over and collect the money.  He then told everyone to "get naked," so they all dropped their pants.  (*Id.*)  Rice testified that he brought $1,500.00 to the game and was up $20.00 at the time of the robbery.  He further testified that the game was not rigged – there was no cheating. (Tr. II at 280-81, 297.)  At some point during the robbery, Petitioner took a swing at Hardy's head with the pistol.  Petitioner missed and dropped the gun, which fell into the corner of

the room.  Petitioner walked over and picked the gun up. (Tr. II at 284-85.)  Rice went to the police

station the next day and spoke to Detective Riley. (Tr. II at 282.)  Rice testified that he did not tell

the police that Hardy was hit in the head with a gun, even if Riley's report indicated otherwise.  (Tr.

II at 317.)  Rice testified that he told the police that Hardy was hit with a bottle and that he was "hit

at" with the gun, but the person missed.  *Id.*

On re-direct, Rice testified that he was positive that Petitioner had a gun and that

McBride hit Hardy over the head with a beer bottle. (Tr. II at 328-30.)  He further testified that he

remembered telling the police officer that Petitioner had a gun and McBride had a bottle. (Tr. II at

332.)

Petitioner and Henry Bridges testified as to Petitioner's version of the events the

night of September 12, 2002.  According to Bridges (a/k/a Ski), McBride and Petitioner came to

Reed's house sometime after Bridges arrived.  (Tr. III at 467-68, 598.)  McBride and Petitioner won

for a while and then left to go to the store to get beer.  Salazar arrived after McBride and Petitioner

left for the store.  (Tr. III at 470.)  Bridges testified that after Petitioner and McBride left, Hardy

started saying that he hated losing, that he "had something" for Petitioner and McBride, and that

everyone should bet with him. (Tr. III at 471-72.)  Hardy started to shoot the dice when McBride

and Petitioner returned and he kept winning.  Bridges knew that something was "fishy about the

dice" because Hardy was winning too much.  (Tr. III at 472.)  Hardy got up to go to the bathroom

and a red die fell from under Hardy's leg.  (Tr. III at 472-73.)  When Hardy came out of the

bathroom McBride and Petitioner confronted Hardy with cheating, which Hardy denied.  Then

McBride hit Hardy over the head with a beer bottle and Hardy dropped the money.  (Tr. III at 474.)

McBride and Petitioner picked up the money, telling Hardy, "[T]hat's what you get for cheating."

McBride and Petitioner then left.  (Tr. III at 474.)  Bridges testified that no one had a gun.  (Tr. III at 478-79.)

Salazar asked Bridges to take him to find Petitioner and McBride.  Bridges testified that Petitioner and McBride kept the money they had lost as a result of Hardy's cheating, but returned the remaining money to Salazar and Bridges.  After Bridges and Salazar had taken their own money, Salazar returned the remaining money to Reed.  (Tr. III at 476.)

Petitioner testified that he arrived with his brother Karl McBride at Reed's house around 11:30 p.m. or midnight.  He gambled for about an hour or seventy-five minutes and was winning. (Tr. III at 539.)  He started losing a few points, so he decided to take a break to go to the store.  (Tr. III at 540.)  Petitioner testified that after he and McBride returned Hardy began winning a lot of difficult throws.  (Tr. III at 546.)  Hardy then went to the bathroom and Petitioner noticed an extra red die on the floor.  Petitioner told everyone that Hardy had cheated them all.  When Hardy returned from the bathroom, Petitioner told Hardy to give him back his money.  When he did not, Petitioner's brother, Karl McBride, hit Hardy in the head and Hardy fell to the ground.  Petitioner told Hardy, "That's what you get for cheating. If you would've give the money back, that would have alleviated everything instead of playing dumb about it.  But he didn't."  (Tr. III at 548.)  According to Petitioner, he took the money off the floor intending only to get his own money back.  (Tr. III at 551.)  He did not intend to steal because he did not want to ruin his reputation in the gambling community.  (*Id.*)

After he left the house, Petitioner discovered that he had more money than he and his brother had lost.  (Tr. III, 555.)  Petitioner was walking when Salazar and Bridges drove up to him.  They told Petitioner that they had lost some money in the incident and Petitioner gave their money

back to them. He also gave them the remaining extra money to return to Reed and the others. (Tr. III at 559-60.) He testified that he and McBride then got into Salazar's car and went to pick up Petitioner's girlfriend, Maya Mason. Salazar dropped off McBride, Mason and Petitioner at the Super 8 motel. (Tr. III at 560.) Petitioner testified that he never had a gun and that the whole robbery story was invented to protect Reed's reputation for running a clean game. (Tr. III at 561-62.) Petitioner testified that he did not rob or assault anyone and that the only assault was when McBride hit Hardy with the bottle. (Tr. III at 573.)

Maya Mason testified that Petitioner came to her mother's door with McBride and Salazar around 2-3 am on September 12, 2000. (Tr. III at 418.) She went with Salazar, Petitioner and McBride to a Super 8 motel. (Tr. III at 420-21.) She admitted that she did not testify to this information at Karl McBride's trial. (Tr. III at 431-32.)

Michael Robinson, Arrashio Brown, and Terrell Winters all testified that Rice and Hardy had reputations in the community for cheating. (Tr. II at 382, 449, 529-30.)

At the conclusion of trial on May 13, 2002, the jury found Petitioner guilty of the armed robbery of James Hardy and guilty of the lesser-included offense of unarmed robbery of Eric Reed, Henry Salazar, and J.D. Rice. (Tr. V, 18.) Petitioner was found not guilty on all four of the felony-firearm counts. (*Id.*)

Prior to sentencing, Petitioner filed a motion to correct a substantive mistake under MICH. CT. R. 6.435(B). On August 19, 2002, the court heard and denied the motion. (Hearing/Sentencing Tr. (S. Tr.) at 3-23.) The court then proceeded to sentence Petitioner as a third-felony offender to a prison term of 27 to 41 years for the armed robbery and three terms of 20 to 30 years for the unarmed robberies. (S. Tr. at 71.)

## B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on April 21, 2003, raised the following issues[2]:

I.      [PETITIONER] WAS DENIED HIS STATE CONSTITUTIONAL RIGHT TO A UNANIMOUS VERDICT ON EVERY ELEMENT OF THE OFFENSES CHARGED.  TO THE EXTENT THAT TRIAL COUNSEL FAILED TO SUFFICIENTLY PRESENT OR PRESERVE THE ISSUE FOR REVIEW, [PETITIONER] WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL

    A.      [PETITIONER] WAS DENIED HIS RIGHT TO A UNANIMOUS VERDICT AS TO THE BASIS FOR HIS ROBBERY CONVICTIONS AND TO HAVE THE JURY INSTRUCTED ACCORDINGLY.

    B.      TO THE EXTENT THAT COUNSEL FAILED TO SUFFICIENTLY PRESENT OR PRESERVE THE ISSUE FOR REVIEW, [PETITIONER] WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL

II.     [PETITIONER] WAS DENIED HIS CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW BY THE FATAL VARIANCE BETWEEN THE INFORMATION, WHICH SPECIFIED ROBBERY WITH A GUN, AND THE JURY INSTRUCTIONS, WHICH PERMITTED CONVICTION FOR ROBBERY WITH A BOTTLE TO THE EXTENT THAT COUNSEL FAILED TO SUFFICIENTLY PRESENT OR PRESERVE THE ISSUE FOR REIVEW, [PETITIONER] WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL.

(Def.-Appellant's Br. on Appeal, docket #27.)  By unpublished opinion issued January 22, 2004, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's conviction and sentence.  (*See* 1/22/04 Mich. Ct. App. Opinion (MCOA Op.), docket #27.)

Petitioner sought leave to appeal to the Michigan Supreme Court on February 27,

---

[2]Petitioner's claims on direct appeal are included in but not coextensive with Petitioner's habeas grounds III, IV and V.  Petitioner's first ground on direct appeal was narrower than his fifth habeas ground, as his claim on direct appeal was based solely on state law rather than on the Due Process Clause of the Fourteenth Amendment.

2004. Petitioner raised the same claims presented to and rejected by the Michigan Court of Appeals. (App. for Leave to Appeal, docket #28.) On September 10, 2004, Petitioner filed a motion and brief to amend his appellate grounds to include a constitutional challenge to his sentence under *Blakely v. Washington*, 542 U.S. 296 (2004), a claim he raises as his ninth habeas ground. By order entered September 28, 2004, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* 9/28/04 Mich. Ord., docket #28.) The supreme court also denied Petitioner's motion to amend to add an additional ground. (*Id.*)

## C. Post-conviction relief

On October 27, 2005, Petitioner filed a motion for relief from judgment in the Muskegon County Circuit Court. The Circuit Court issued an opinion and order denying the motion on September 26, 2006. (*See* 9/26/06 Cir. Ct. Ord., docket #1-10.) He then filed an application for leave to appeal to the Michigan Court of Appeals, raising eleven grounds for relief that, although phrased differently, are substantially the same as those raised in his habeas petition. (Def.-Appellant's App. for Leave to Appeal, docket #29.) On December 22, 2008, the court of appeals denied leave to appeal for failure to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D). (*See* 5/21/07 MCOA Ord., docket #29.) Petitioner then sought leave to appeal to the Michigan Supreme Court raising substantially the same grounds. (Def.-Appellant's App. for Leave to Appeal, docket #30.) The Michigan Supreme Court denied leave to appeal because the Petitioner "failed to meet the burden of entitlement under MCR 6.508(D)." (12/22/07 Mich. Ord., docket #30.)

II.    Proposed Conclusions of Law

A.    **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final."  *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## B.    Procedural Default

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52.

Petitioner presented on direct appeal a portion of only three of his nine habeas grounds. Petitioner raised his remaining claims in his motion for relief from judgment, which the trial court denied both on the merits and because Petitioner did not raise the claims on direct appeal in violation of MICH. CT. R. 6.508(D). The Michigan Court of Appeals and the Michigan Supreme Court both relied upon MCR 6.508(D) in denying Petitioner's claims. The majority of Petitioner's

claims, therefore, appear to be procedurally defaulted. *But see Guilmette v. Howes*, 624 F.3d 286, 289-90 (6th Cir. 2010) (indicating that standard orders of the Michigan appellate courts that simply invoke MICH. CT. R. 6.508(D) may not be sufficient to invoke a procedural default). Petitioner, contends that, if his claims are deemed procedurally barred, the ineffective assistance of trial and appellate counsel constitute cause excusing his procedural default.

The Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)); *see also* 28 U.S.C. § 2254(b)(2). Where, as here, the procedural default issue raises more questions than the claims on the merits, I need not and do not decide whether Petitioner could show cause and prejudice for his default. *See Hudson*, 351 F.3d at 216..

### C.     Alleged Variance and Lack of Fair Notice

In grounds III and IV of his habeas application, Petitioner claims that he was denied his constitutional rights to fair notice under the Sixth and Fourteenth Amendments because there was a fatal variance between the charging document, the theory at trial, and the original and supplemental jury instructions. He specifically objects to the court's instruction on the dangerous-weapon element of armed robbery, the aiding-and-abetting instruction, and a supplemental instruction provided in response to a jury question.

The judge instructed the jury on the second element of armed robbery as follows:

> Now, second, at the time of the assault the defendant was armed with a weapon designed to be dangerous and capable of causing death or serious injury or with any other object capable of causing death or serious injury that the defendant used as a weapon or with any other object used or fashioned in a manner to lead the person who was assaulted to reasonably believe that it was a dangerous weapon.

(Tr. IV at 739-40.)  The court then gave the following aiding-and-abetting instruction:

> Now, the prosecutor has charged here that Mr. Robinson aided and abetted a man, Karl McBride, in the commission of these armed robberies or the other offenses associated with these armed robberies . . . . But as to the charge of armed robbery, unarmed robbery, larceny from a person and larceny in a building, of these four individuals, Mr. Robinson is charged with intentionally assisting Karl McBride in committing those offenses.
>
> Now anyone who intentionally assists someone else in committing a crime is as guilty as the person who directly commits it and can be convicted of that crime as what we call an aider and [a]bett[o]r.  And to prove that, the prosecutor must prove beyond a reasonable doubt, first, that the alleged crime was actually committed either by the defendant or, in this case, Mr. McBride, and it doesn't matter whether or not anyone has been convicted of that crime; second, that before or during the crime the defendant, Mr. Robinson, did something to assist in the commission of a crime; third, that the defendant must have intended the commission of a crime alleged or must have known that the other person intended its commission at the time of giving that assistance.

(Tr. IV at 743-44.)  During deliberations, the jury submitted the following question to the court:

> Can [defendant] . . . be charged with armed robbery under the aiding and abetting law when his partner has in his hand during the robbery a deadly weapon in the form of a broken beer bottle?

(Tr. V at 3.)  In response to the question, the trial court gave the following supplemental instruction:

> The Defendant can be charged and convicted of armed robbery if you find beyond a reasonable doubt that Karl McBride assaulted either Hardy or Rice or Salazar or Reed with a dangerous weapon and the other elements of armed robbery are proven beyond a reasonable doubt and you are satisfied beyond a reasonable doubt that this defendant aided and abetted Karl McBride in that process.  Of course you have to consider each of those armed robbery charges for each count separately.

(Tr. V at 15.)

The Michigan Court of Appeals addressed as follows Petitioner's claims about the variance and the associated jury instructions:

> Defendant next argues that the trial court impermissibly broadened the scope of the original information by instructing the jury that defendant could be found guilty of

15

armed robbery if he aided and abetted McBride. The trial court read the information for armed robbery as follows:

> That on or about September 12[th] of the year 2000 in the city of Muskegon at 420 Allen Avenue, Deyonta Robinson assaulted [complainant] while being armed with a dangerous weapon or an article used or fashioned in a manner to lead [complainant] to reasonably believe it to be a dangerous weapon, specifically a gun, and did then and there feloniously rob, steal and take from the person . . . .

Defendant insists that he was convicted of a crime for which he was not charged because the trial court read the above information to potential jurors, but then improperly broadened the scope of that information by instructing the jury on the aiding and abetting theory. We disagree.

A defendant may not be convicted of a crime for which he has not been charged. *People v Kelley,* 78 Mich App 769, 776; 260 NW2d 923 (1977). But the distinction between committing a crime as the principal and as an aider and abettor has been abolished. "Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be *prosecuted, indicted, tried* and on conviction shall be punished as if he had directly committed such offense." MCL 767.39 (Emphasis added). Therefore, aiding and abetting the armed robbery or unarmed robbery is not a separate *charge*, but merely a different *theory* from which to find defendant's guilt. Accordingly, the information provided adequate notice. *People v McKeighan*, 205 Mich 367, 370-371; 171 NW 500 (1919); *People v Palmer*, 42 Mich App 549, 553; 2[0]2 NW2d 536 (1972). There was no variance between the information charged and the jury instructions because aiding and abetting is not a separate *charge*; it is merely a separate *theory* for conviction under the same charge.

(1/22/2004 Mich. Ct of Appeals (MCOA) Op. at 4-5, docket #27.) Petitioner contends that the Michigan Court of Appeals did not properly address his claim that he did not receive fair notice that he would have to defend against a theory that he could be convicted of aiding and abetting in an armed robbery where McBride used a beer bottle as a dangerous weapon. (Br., Page ID # 540.) He asserts that the dangerous-weapon instruction, the aiding-and-abetting instruction, and the supplemental instruction collectively deprived him of due process.

Ordinarily, a claim that a trial court gave an improper jury instruction or otherwise failed to follow state law is not cognizable on habeas review.  *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977); *Estelle v. McGuire*, 502 U.S. 62, 75 (1991).  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle*, 502 U.S. at 68.  To merit habeas relief, a petitioner must show that an erroneous jury instruction "so infected the entire trial that the resulting conviction violates due process." *Henderson*, 431 U.S. at 155; *see also Estelle*, 502 U.S. at 75 (erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law"); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000) (same).

According to Petitioner, the instructions were fundamentally unfair because of a fatal variance between the crime as charged and the crime on which the jury was instructed.  The Sixth Amendment provides a criminal defendant the fundamental right to be informed of the nature and cause of the accusations against him.  U.S. Const. amend. VI.  The Supreme Court has recognized that a state defendant's right to fair notice and an opportunity to defend is protected by the Due Process Clause of the Fourteenth Amendment.  *See Jackson v. Virginia*, 443 U.S. 307, 314 (1979) ("It is axiomatic that a conviction upon a charge not made or upon a charge not tried constitutes a denial of due process."); *Cole v. Arkansas*, 333 U.S. 196, 201 (1948); *In re Oliver*, 333 U.S. 257, 273 (1948).

"[D]ue process mandates only that the indictment provide the defendant with 'fair notice of the charges against him to permit adequate preparation of his defense.'"  *Williams v. Haviland*, 467 F.3d 527, 535 (6th Cir. 2006) (quoting *Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir.

1984)).  And fair notice is given if "the offense [is] charged with precision and certainty so as to apprise the accused of the crime of which he stands charged.  Such definiteness and certainty are required as will enable a presumptively innocent man to prepare for trial."  *Combs v. Tennessee*, 530 F.2d 695, 698 (6th Cir. 1976).  However, "[a]n indictment which fairly but imperfectly informs the accused of the offense for which he is to be tried does not give rise to a constitutional issue cognizable in habeas proceedings."  *Mira v. Marshall*, 806 F.2d 636, 639 (6th Cir. 1986); *see also United States v. Beasley*, 583 F.3d 384, 389-90 (6th Cir. 2009) (discussing the distinction between an amendment to the charging document and a variance, which requires a showing of prejudice).  Prejudice will not be found absent some kind of harmful effect to the defense from the lack of notice.  *Koontz v. Glossa*, 731 F.2d 365, 370 (6th Cir. 1984); *Roe v. Baker*, 316 F.3d 557, 570 (6th Cir. 2002).

Here, the state court reasonably concluded that the information was not impermissibly amended by the trial court's instructions.  First, Michigan has abolished the distinction between commission of an offense as a principal or as an aider and abettor, so, under Michigan law, the information charging Petitioner as a principal also is sufficient to charge him as an aider and abettor.  *See* MICH. COMP. LAWS § 767.39; *People v. McKeighan*, 171 N.W.2d 500, 501 (Mich. 1979).  Second, each information contained the specifics of the date and location of the alleged robbery and the victim of that robbery.  The information also specified that Petitioner was "armed with a dangerous weapon or an article used or fashioned in a manner to lead [complainant] to reasonably believe it to be a dangerous weapon . . . ."  The mere fact that the prosecutor added "specifically a gun" to the definition of the dangerous weapon did not narrow the scope of the charged offense of armed robbery.  Petitioner unquestionably was apprised of the crimes for which

18

he was charged. *See Combs*, 530 F.2d at 698. Throughout the trial and conviction, the charged crimes remained the same, as did the date, location, victims and overall course of conduct in issue. The difference between the crime described in the information and the crime as proved and instructed at trial, therefore, at best amounts to a minor variance.

As a result, Petitioner is required to show prejudice to his defense. Petitioner cannot demonstrate the necessary prejudice. Petitioner defended the charges on the ground that he lacked the necessary intent to deprive the victims of their money permanently. Instead, he acted under a claim of right, intending only to take his own money back from the individuals who had cheated him at gambling. Moreover, Petitioner cannot demonstrate that he was surprised by the potential theory that the beer bottle was used as a dangerous weapon. Rice testified at the preliminary hearing that McBride used the bottle to hit Hardy over the head just as Petitioner announced that it was a "stick-up." (Prelim. Ex. Tr., docket #11 at 7.) At trial, although Petitioner disputed the testimony that he possessed a firearm, he admitted that his cousin Karl McBride hit Hardy over the head with a bottle and that Petitioner picked up the money Hardy dropped after he was hit. As a result, the defense rested not on the type of weapon used, but instead on whether he had the intent to rob.

Additionally, Petitioner was aware well before the time the jury was instructed that the bottle could be found to be a dangerous weapon used in the armed robbery. All of the witnesses testified that McBride hit Hardy over the head with a bottle before Petitioner took the money. At the close of the prosecution's case, defense counsel moved for a directed verdict arguing, in part, that a bottle is not dangerous weapon and therefore, as a matter of law, no armed robbery with regard to Hardy took place. (Tr. II at 362.) The trial court denied the motion. (Tr. II at 365.)

19

For all these reasons, the Court finds that Petitioner was provided fair notice of the charges brought against him, in compliance with the Sixth Amendment and Due Process Clause. In addition, to the extent that Petitioner may intend to argue that the instructions were otherwise wrong, he fails to present a meritorious federal claim. The state court's determination therefore was neither contrary to, nor involved an unreasonable application of, clearly established Supreme Court law, nor was it based upon an unreasonable determination of the facts in light of the evidence.

### D.      Unanimous Verdict

In his fifth habeas ground, Petitioner argues that he was denied due process because he was denied his state constitutional right to a unanimous verdict on every element of the offenses charged.  Petitioner argues that the erroneous instruction on armed robbery permitted members of the jury to find him guilty of armed robbery on more than one theory:  (1) that he was armed with a gun at the time he committed the robbery or robberies; or (2) that he aided and abetted Karl McBride, who was armed with a bottle, at the time he committed the robbery or robberies.  As I earlier noted, Petitioner argued in his direct appeal only that the lack of unanimity violated state law. The Michigan Court of Appeals thoroughly addressed the state constitutional claim.  Petitioner now claims that the lack of unanimity deprived him of his federal constitutional right to due process.

As previously discussed, in order to obtain habeas relief on the basis of a jury instruction, the petitioner must show that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process." *Henderson*, 431 U.S. at 155.  If Petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law.  *Id.*

While the Sixth Amendment of the United States constitution includes the right of an accused to a unanimous verdict in federal criminal prosecutions, *see Richardson v. United States*,

526 U.S. 813 (1999), the Supreme Court repeatedly has held that unanimity in state prosecutions is not required by the Due Process Clause of the Fourteenth Amendment. *See Schad v. Arizona*, 501 U.S. 624, 630 (1991) (capital offense); *Brown v. Louisiana*, 447 U.S. 323, 330-31 (1980); *Apodaca v. Oregon*, 406 U.S. 404, 410-11 (1972); *Johnson v. Louisiana*, 406 U.S. 356, 360 (1972). Moreover, even in federal criminal prosecutions, the Supreme Court has distinguished between the requirement of unanimity on the elements of a crime, and the requirement of unanimity on the means by which an element may be accomplished. *Richardson*, 526 U.S. at 817. The Court has declined to require unanimity on the latter. *Id.*

Petitioner's claim is foreclosed by *Schad*, 501 U.S. 624. The *Schad* Court concluded that due process permitted state-court jurors to find a petitioner guilty beyond a reasonable doubt of first-degree murder without unanimously agreeing whether the petitioner had committed the offense because he committed premeditated murder or because he committed felony murder. *Id.* at 632 ("Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.") Similarly here, Petitioner complains that the jury was allowed to find the dangerous-weapon element of the armed-robbery offense without agreeing on whether he acted as a principal or an aider and abettor. The fact that the jurors were not required to unanimously find that element by a single theory did not violate the Due Process Clause. *Id.*

Petitioner argues, however, that the *Schad* Court recognized that the Due Process Clause places some "limits on a State's capacity to define different courses of conduct, or states of mind, as merely alternative means of committing a single offense . . . ." *Id.* Petitioner contends that the language of *Schad* suggests that due process may, in some circumstances, require jury unanimity.

He asserts that, in his case, the lack of jury unanimity was fundamentally unfair and violated due process because it was compounded by the variance between the information and the instruction.

The language of *Schad* does not support Petitioner's argument. The *Schad* Court merely recognized that a "statute may not forbid conduct in terms so vague that people of common intelligence would be relegated to differing guesses about its meaning." *Id.* (citing *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939)). Petitioner does not argue that the charged offense was impermissibly vague. Instead, he argues that the two alleged deprivations – the denial of fair notice and the lack of jury unanimity – together rise to the level of a due process violation. As I previously have discussed, the state court reasonably determined that any variance between the information and the instructions did not violate due process. Moreover, Petitioner's claim essentially asks this Court to cumulate the harms caused by the two alleged constitutional errors. The Sixth Circuit repeatedly has concluded that cumulative error claims are not cognizable on habeas review because "[t]he Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief." *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002); *see also Keith v. Mitchell*, 455 F.3d 662, 679 (6th Cir. 2006); *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006).

As a consequence, the state-court's determination of Petitioner's claim was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. Petitioner therefore is not entitled to habeas relief on this claim.

## E.      References to the McBride Trial

In his second ground for habeas relief, Petitioner argues that he was denied due process and his right to confront witnesses when the trial court permitted the prosecutor to refer to the McBride trial in his questions and arguments.  Specifically, Petitioner alleges that the court improperly permitted the prosecutor to impeach Henry Salazar with his testimony from the McBride trial.  (Tr. II at 266-72.)  He also alleges that the prosecutor improperly impeached Maya Mason by asking her why she did not testify at Petitioner's brother's trial, given that she had a close relationship with McBride, too.  (Tr. II at 430-33.)  Petitioner complains that the prosecutor asked the same questions of Arrashio Brown, who also was close friends with McBride.  (Tr. III at 456.)  In addition, Petitioner argues that the prosecutor improperly impeached Petitioner with his own failure to testify at his brother's trial. (Tr. III at 583-87, 588-89.)   Finally, he objects to the prosecutor's reference during closing argument to Petitioner's failure to testify.  (Tr. IV at 680-81.)  Petitioner claims that the references effectively informed the jury that McBride already had been found guilty of the charges.

The question of the admissibility of information about McBride's trial was before the court early in the trial proceedings.  During his opening statement, the prosecutor indicated that some of the witnesses the jury would hear had also testified in Karl McBride's trial.  (Tr. I at 136.)  Defense counsel moved for a mistrial, arguing that any reference to the testimony at the co-defendant's trial was improper.  The prosecutor acknowledged that he was proscribed from mentioning the outcome of the trial, but he argued that he could used the transcript to impeach or rehabilitate witnesses.  (Tr. I at 137.)  The court held that it was not improper to indicate that a co-defendant's trial had occurred, but that the prosecution was not entitled to make reference to the fact

of conviction.  (Tr. I at 137.)  The court therefore denied Petitioner's motion for mistral, but indicated that the prosecutor could not mention the conviction or use transcripts from the McBride trial in his case in chief.  (Tr. I at 138.)

Thereafter, the prosecutor impeached witnesses Henry Salazar, Maya Mason and Arrashio Brown, by inquiring why they had not testified at McBride's trial.  Defense counsel again sought a mistrial, arguing that the repeated references to McBride's trial effectively suggested to the jury that McBride was convicted.  (Tr. III at 462-63.)  The trial court denied the motion, concluding that the prosecutor's references to the other trial had been no more than impeachment questions calling into question the witnesses' credibility.  (Tr. III at 463.)  The court found the information to be relevant and concluded that it in no way indicated the outcome of the trial.  (Tr. III at 464-65.)  The trial court again rejected the claim on the merits in denying Petitioner's motion for relief from judgment.  (9/26/06 Cir. Ct. Ord., docket #29.)

As the Supreme Court explained in *Estelle*, 502 U.S. 62, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id.* at 67-68.   State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  This approach accords the state courts wide latitude in ruling on evidentiary matters.  *Seymour*, 224 F.3d at 552 (6th Cir. 2000).  Further, under the AEDPA, the court may only grant relief if Petitioner is able to

show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders*, 221 F.3d at 860.

Petitioner argues that the state court improperly concluded that references to the McBride trial for purposes of impeaching the credibility of witnesses did not improperly suggest that McBride had been convicted. Relying on *Kirby v. United States*, 174 U.S. 47, 55-56 (1899), Petitioner suggests that the admission of evidence regarding McBride's conviction violated Petitioner's rights to confront witnesses under the Sixth Amendment and his right to a fair trial under the Due Process Clause of the Fourteenth Amendment. In *Kirby*, the Supreme Court held that, where none of the witnesses were produced at the petitioner's trial, the prosecution's introduction of three co-defendants' convictions to prove the petitioner's guilt violated the petitioner's right to confront witnesses under the Sixth Amendment. *Id.*

The *Kirby* decision is inapplicable to the instant case. Here, in contrast with *Kirby*, the trial court expressly found that the prosecutor's references to the McBride trial did not indicate whether McBride had been convicted. (Tr. III at 463-65.) The trial court's conclusion is one of fact that is presumed by this Court to be correct, and Petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Petitioner fails entirely to meet his burden. The trial court never allowed evidence of McBride's conviction to be introduced at trial. In addition, all of the references to the prior trial involved witnesses who were present at Petitioner's trial and subject to examination or cross-examination by the defense. The Supreme Court has long read the right of confrontation as securing

only an adequate opportunity to cross-examine adverse witnesses. *United States v. Owens*, 484 U.S. 554, 557 (1988) (citing *Mattox v. United States*, 156 U.S. 237, 242-43 (1895) and *Douglas v. Alabama*, 380 U.S. 415, 418 (1965)). Because Petitioner had the opportunity to question all witnesses against him, he was not deprived of his right of confrontation.

Moreover, the references to the McBride trial clearly constituted relevant impeachment. As I have discussed, the references to which Petitioner objects were limited to the prosecutor's attempts to impeach the witnesses' credibility and to support an inference that their stories were recently fabricated. In none of the cited instances did the prosecutor suggest the outcome of the McBride trial. Nor was the outcome necessarily implied. The prosecutor's argument would have been equally valid had McBride been acquitted; if the witnesses current stories were true, they would have had a reason to tell those stories at the earlier trial in order to improve McBride's chances of acquittal.

For all these reasons, the state court's rejection of Petitioner's second habeas ground was based on entirely reasonable determinations of both fact and established law.

F.    **Inconsistent Theories**

In his sixth habeas ground, Petitioner contends that his Sixth and Fourteenth Amendment rights were violated because the prosecutor used inconsistent theories during the separate trials of Petitioner and his brother, Karl McBride. Petitioner contends that the state courts' rejection of his claim of inconsistency was contrary to the United States Supreme Court's holding in *Bradshaw v. Stumpf (Stumpf II)*, 545 U.S. 175 (2005), which reversed the Sixth Circuit case *Stumpf v. Mitchell (Stumpf I)*, 367 F.3d 594 (6th Cir. 2001).

Assuming for purposes of argument that the prosecutor's theories were inconsistent during the two trials, Petitioner's claim is without merit. In *Stumpf I,* the Sixth Circuit vacated a defendant's guilty plea and death sentence, reasoning "that the use of inconsistent, irreconcilable theories to convict two defendants for the same crime is a due process violation." *Id.* at 611, 616. However, the Supreme Court "later reversed the Sixth Circuit's judgment concerning the defendant's guilty plea, vacated the judgment concerning the death sentence, and remanded for further consideration of the defendant's 'prosecutorial inconsistency claim' as it related to his 'death sentence in particular.'" *Unites States v. Williams*, 612 F.3d 500, 514 (6th Cir. 2010) (citing *Stumpf II*, 545 U.S. at 186-88). The Supreme Court expressly declined to decide whether prosecutorial inconsistency violates due process. *Stumpf II*, 545 U.S. at 187; s*ee also id.* at 190 (Thomas, J., concurring) ("This Court has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories.").

As a result, there exists no clearly established Supreme Court precedent holding that an inconsistent prosecutorial strategy would violate a defendant's due process rights. *Williams*, 612 F.3d at 514-15 (citing *Blalock v. Wilson*, 320 F. App'x 396, 418 n.26 (6th Cir. 2009). The state court's denial of Petitioner's sixth habeas ground was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

### G.    Prosecutorial Misconduct

In Ground VII of his habeas application, Petitioner alleges that his due process rights were violated by prosecutorial misconduct. He claims that the prosecutor committed the following four acts of misconduct: (1) he improperly vouched for a witness; (2) he improperly referred to the McBride trial and implied that McBride had been found guilty; (3) he improperly attempted to

impeach witnesses by suggesting they should have contacted the police or prosecutor before trial; and (4) he improperly injected his own testimony into the trial by talking to witnesses, bringing prior consistent statements into the trial, and attempted to discredit Petitioner for not sharing information with the prosecutor.

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See id.* at 12-13 (1985); *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

*1.     Alleged vouching during closing argument*

Petitioner asserts that the prosecutor improperly vouched for witnesses in the closing argument. Petitioner specifically identifies the following allegedly improper comments by the prosecutor[3]:

---

[3]The portions noted in bold indicate the precise words to which Petitioner objects.

**Let me tell you why I believe Eric** – why you should believe that Eric is telling you the truth. . . .

That's what makes Eric so credible, what makes Eric so believable. Despite that pressure, despite the fact that he could lose his life based on those threats, **he comes in here and tells you the truth**. . . .

**I would submit to you, ladies and gentlemen, that Eric's testimony alone, by itself, shows that the defendant is guilty of armed robbery and you don't need more than that.** But let's talk about additional proof. . . .

**If anyone would exaggerate it would be James, but he doesn't because he's telling you the truth.** And although it would strengthen the case for James to say I saw [Petitioner] with that gun, it's not true. He didn't see it. So he tells us what he saw. He tells you what he heard. But it corroborates what Eric says. . . .

**James Hardy is extremely credible**, and taken with Eric's testimony, there's proof beyond a reasonable doubt that [Petitioner] is guilty of armed robbery. J.D. Rice- - let's talk about why he should be believed. . . .

But I would comment about J.D. because again I think it's really important that you had a chance to see him instead of just hearing something that he may have said to a police officer. You can sense that he isn't terribly educated, didn't go very far in school. He's not very articulate. He doesn't express himself very well. **And we don't pick our victims.** I mean, this didn't happen at a church bingo where we have people who are all well educated, who are people who articulate themselves well. **Doesn't mean he's lying because he maybe is not as educated or he's not as articulate.** . . .

[Petitioner] committed an armed robbery, four of them, and no matter how much defense counsel tried, **there were unshakeable truths that J.D. told you.** [Petitioner] and Karl robbed him. He testified to that. No question about that. He never contradicted, never wavered from that from the beginning to the end. Hardy got hit over the head. Never contradicted. D told everyone to get down; this is a robbery. Never contradicted. The facts that matter, the facts that you need to decide as to whether or not the defendant is guilty or not guilty, are completely consistent. . . .

Henry was – he was hard to get here to trial, about as reluctant a witness as you can get. . . . He knows the phrase 'snitches get stitches.' If I rat out on one of my friends, I'm going to get cut. He knows that. And ladies and gentleman, it would have been so easy for him to say: Robbery? What robbery? I don't know any robbery. **Or he could have been like Easky, came in here and told a story,** said, well, no, it was just a fight over some gambling proceeds that ended up in a bottle being knocked

over the head [sic] . . . He didn't because it wasn't true. And in the end, although he didn't want to be here, . . . he tells you the truth, as painful as it was. He has no motive to lie whatsoever. . . .

And again how easy would it have been for Henry to say, yeah, that's [that Petitioner returned the money] true, that's true, you know? I wasn't the target of this. **He tells you the truth, ladies and gentlemen. He tells you the truth. The difference between him and Ski is he's not willing to lie to protect a friend.** . . .

Is this person trustworthy? . . . **Ski is a thug and he is here to protect his buddy.** His convictions tell you how trustworthy he is, how credible he is. . . .

(Tr. IV at 657-59, 662-63, 665-67, 671, 674.)

The federal courts generally have recognized two types of objectionable vouching. *See Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008); *Brown v. McKee*, 231 F. App'x 469, 478 (6th Cir. 2007) (citing *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999)). The first type impermissibly places the government's prestige behind the witness to bolster the witness' credibility. *Francis*, 170 F.3d at 550; *United States v. Carroll*, 26 F.3d 1380, 1388-89 (6th Cir. 1994); *Drew v. Collins*, 964 F.2d 411, 419 (5th Cir. 1992). In the second type of impermissible vouching, also known as bolstering, the prosecutor invites the jury to believe that there is other evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt. *See Francis*, 170 F.3d at 551; *United States v. Medlin*, 353 F.2d 789, 796 (6th Cir. 1965); *Henderson v. United States*, 218 F.2d 14, 19 (6th Cir. 1955).

The Muskegon County Circuit Court specifically addressed only Petitioner's first transcript reference, in which the prosecutor stated, "Let me tell you why I believe Eric. . . ." (Pet. Br., Page ID # 553.) The Muskegon County Circuit Court found that the prosecutor's comment was not improper vouching, as the prosecutor immediately rephrased his comment to clarify that he was not intending either to bolster the witness or to suggest that he had additional information not known

to the jury.  In addition, the court found that any error was harmless.  The court therefore rejected Petitioner's claim of impermissible vouching.

The circuit court's denial of Petitioner's prosecutorial-misconduct claim was patently reasonable.  Neither type of unconstitutional vouching is involved in this case.  Examined within their surrounding contexts, each of the contested comments was clearly directed to how the record evidence supported or undermined each witness' credibility.  It is appropriate for the prosecutor to invite the jury to examine the testimony they have heard at trial, draw reasonable inferences, and examine the motives witnesses may have for lying.  *See Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000); *Cantrell v. Gray*, No. 84-3686, 1986 WL 16540, at *3 (6th Cir. Feb. 7, 1986); *see also United States v. Eltayib*, 88 F.3d 157, 173 (2d Cir. 1996); *Rodriguez v. Peters*, 63 F.3d 546, 564 (7th Cir. 1995); *Kappos v. Hanks*, 54 F.3d 365, 368 (7th Cir. 1995).  Contrary to Petitioner's claim, the prosecutor did no more than highlight testimony and argue reasonable inferences from that testimony.  "The jurors would know that these comments were inferences, and they would not be confused into believing that these comments were factual evidence."  *Byrd*, 209 F.3d at 536.

Moreover, even if some small part of the prosecutor's argument could be deemed improper comment, any impropriety was necessarily isolated.  *See Darden*, 477 U.S. at 181 (recognizing that the pervasiveness of impropriety is relevant to the fairness of the trial).  Further, instructing a jury that the arguments are not evidence has frequently been deemed to cure any improprieties in a closing argument.  *See, e.g., Byrd*, 209 F.3d at 538; *see also Darden*, 477 U.S. at 181-82 (recognizing that the giving of curative instructions is a factor in determining whether any alleged misconduct deprived a defendant of a fundamentally fair trial).  Similarly, instructing the

jury regarding the methods it should use to evaluate credibility helps to cure any improprieties. *Id.* In this case, the court gave both instructions. (Tr. IV, 734-39.)

For all these reasons, Petitioner has failed to demonstrate that any improper comments were made, much less that prosecutorial comments "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 643). The state courts' denial of his claim therefore constituted a reasonable application of established Supreme Court precedent.

### 2. *References to McBride's trial*

Petitioner next contends that the prosecutor improperly referenced McBride's trial, as well as its outcome. As I previously have concluded, the trial court's admission of the references to McBride's trial was entirely reasonable. Because the references were not unconstitutional, the prosecutor's questions and arguments about the McBride trial were not improper, much less so egregiously improper as to rise to a violation of due process.

### 3. *Alleged improper cross-examination*

Petitioner next argues that he is entitled to habeas relief because the prosecutor questioned Maya Mason, Arrashio Brown and Henry Bridges about why they did not approach the police or prosecutor with their evidence sometime before trial. He also contends that the prosecutor improperly argued the to the jury that it could draw credibility inferences from the witnesses' failure to tell anyone their version prior to Petitioner's trial.

As I previously discussed, the Court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme

Court did on a set of materially indistinguishable facts. *Sanders*, 221 F.3d at 860. Petitioner makes

no attempt to demonstrate that state court's evidentiary rulings were barred by existing Supreme

Court precedent. Petitioner cites no Supreme Court case – or any other case – that supports his

conclusory claim that the prosecutor's impeachment of the witnesses was improper. To the contrary,

his recitation of the alleged misconduct fully supports the state-court's determination that the

prosecutor's questions constituted legitimate impeachment and that the prosecutor was free to argue

reasonable inferences from the witnesses' answers.

### 4.     *Injecting personal testimony*

In his final claim of prosecutorial misconduct, Petitioner makes a hodge-podge of

allegations. First, he suggests that the prosecutor improperly spoke with a defense witness before

the witness testified. Specifically, he objects to the prosecutor's question to Arrashio Brown about

whether Brown had indicated that he did not want to talk to the prosecutor before trial. Second,

Petitioner suggests that the prosecutor improperly injected inadmissible prior consistent statements

into the record by asking Salazar if he had testified the same way at McBrides' trial. Third,

Petitioner argues that the prosecutor improperly questioned him about receiving copies of the

transcripts and police reports from McBride's trial.

Petitioner's objections all are directed at the questioning of unwilling witnesses on

direct and cross-examination. First, contrary to Petitioner's argument, the prosecutor did not

"testify" to the content of his discussion with Arrashio Brown. Instead, the prosecutor asked Brown

whether he had declined to speak with the prosecution before taking the stand. When Brown

provided a narrative answer that suggested that the prosecutor had implied the availability of some

unspecified deal, the prosecutor asked a series of questions seeking clarification of Brown's

assertion. In response, Brown's answers became increasingly vague and evasive, causing Brown to appear to be less than truthful. (Tr. III at 450-51.) While Petitioner may wish that the prosecutor had not been so successful in casting doubt on Brown's credibility, nothing about the prosecutor's series of questions was improper.

Similarly, Petitioner's complaint that the prosecutor engaged in misconduct by asking witnesses to explain why they had not come forward earlier is frivolous. Such questions constituted proper impeachment. The questions did not become improper simply because the witnesses' credibility was damaged by the questions. Instead, the questions merely demonstrated the prosecutor's effectiveness as an advocate and highlighted the witnesses' problems with credibility.

Petitioner argues that the prosecutor questioned Salazar about his testimony at McBride's trial in order to improperly introduce "consistent" evidence that was inadmissible. Petitioner appears to refer to MICH. R. EVID. 801(d)(1), which bars the admission of prior consistent statements except for limited purposes. First, as I repeatedly have discussed, whether evidence was properly admitted is a matter of state law is not cognizable in this court on habeas review. *Estelle*, 502 U.S. at 67-68. Instead, state evidentiary rulings cannot rise to the level of due process violations unless they offend some established fundamental principle of justice. *Id.* And this Court must defer to a state court's determination of the question unless it is unreasonable. 28 U.S.C. § 2254(d). Petitioner has not even argued, much less shown such a due process violation. In addition, as a purely factual matter, no evidentiary error occurred. The prosecutor properly questioned Salazar about his prior inconsistent – not consistent – statement at the McBride trial.

In sum, Petitioner fails to identify any prosecutorial impropriety – much less constitutionally significant prosecutorial misconduct. Moreover, even had the prosecutor

committed error, that error would have been cured by the trial court's instruction to the jury that the "lawyers' statements or their arguments or their questions are not evidence." (Tr. IV at 734.) For all these reasons, the state court's denial of Petitioner's prosecutorial-misconduct claim was neither contrary to nor an unreasonable application of established Supreme Court precedent.

### G. Cumulative Error

In Ground I of his petition, Petitioner alleges that the allegations regarding ambush in Ground III, variance in Ground IV, unanimous verdict in Ground V, inconsistent theories in Ground VI and due process violations in Grounds II and VII resulted in cumulative error violating his constitutional rights. As discussed in relation to Petitioner's claims in Ground V, the Supreme Court never has held "that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief." *Scott*, 302 F.3d at 607; *see also Keith*, 455 F.3d at 679; *Williams*, 460 F.3d at 816; *Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004). As a result, there exists no clearly established Supreme Court precedent that supports Petitioner's claim. Moreover, because I concluded above that the individual claims all are without merit, Petitioner cannot show that the cumulative error violated his constitutional rights. *See Seymour*, 224 F.3d at 557. For both reasons, the state-court reasonably rejected Petitioner's first habeas ground.

### H. Sentencing Issues

Petitioner raises two sentencing claims. First, in Ground VIII of his habeas application, Petitioner asserts that his rights under both the Due Process Clause of the Fourteenth Amendment and the Confrontation Clause of the Sixth Amendment were violated by the incorrect scoring of offense variables (OV) 7 and OV13 and by the sentencing judge's consideration of testimony from McBride's trial. Second, in Ground IX, he alleges that he was deprived of his rights

under the Sixth and Fourteenth Amendments when the trial court increased his sentence based on facts found by the judge rather than the jury.

### 1. Improper scoring and minimum sentence

In his eighth ground for habeas relief, Petitioner argues that the evidence relied upon by the state court was inadequate to support a finding of "excessive brutality" that would support a score of 50 points on OV7. In addition, he argues that, in reaching its score on OV7, the sentencing court impermissibly relied on evidence of the crime that was presented in the McBride trial. Further, he argues, OV 13 was improperly scored at 25 points under Michigan law because the offense was not "part of a pattern of felonious criminal activity involving 3 or more crimes against a person." MICH. COMP. LAWS § 777.43(1)(c). Finally, he argues that the judge impermissibly added two years to his 25-year minimum sentence to bring his minimum sentence to that of Karl McBride, whose 27-year minimum reflected his conviction of felony-firearm, a crime of which Petitioner was acquitted. Petitioner contends that the various errors violated his rights under the Due Process Clause and the Confrontation Clause.

As an initial matter, there is no constitutional right to individualized sentencing in non-capital cases. *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991); *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995); *see also Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978) (in a case holding that mitigating factors must be fully considered in death penalty cases, the Court "recognize[d] that, in noncapital cases, the established practice of individualized sentences rests not on constitutional commands, but on public policy enacted into statutes."). A criminal defendant has "no federal constitutional right to be sentenced within Michigan's guideline minimum sentence recommendations." *Doyle v. Scutt*, 347 F. Supp. 2d 474, 485 (E.D. Mich. 2004); *accord Lovely v.*

*Jackson*, 337 F. Supp. 2d 969, 977 (E.D. Mich. 2004); *Thomas v. Foltz*, 654 F. Supp. 105, 106-07 (E.D. Mich. 1987). Petitioner's claim that the sentencing judge improperly applied Michigan sentencing guidelines therefore is a matter strictly of state law.

Although state-law sentencing errors generally are not reviewable in a federal habeas proceeding, an alleged violation of state law "could, potentially, 'be sufficiently egregious to amount to a denial of equal protection or of due process of law guaranteed by the Fourteenth Amendment.'" *Koras v. Robinson,* 123 F. App'x 207, 213 (6th Cir. Feb. 15, 2005) (citing *Bowling v. Parker*, 344 F.3d 487, 521 (6th Cir. 2003)). *See also Doyle*, 347 F. Supp. 2d at 485 (a habeas court "will not set aside, on allegations of unfairness or an abuse of discretion, terms of a sentence that is within state statutory limits unless the sentence is so disproportionate to the crime as to be completely arbitrary and shocking.") (citation omitted). A sentence may violate due process if it is based upon material "misinformation of constitutional magnitude." *Koras,* 123 F. App'x at 213 (quoting *Roberts v. United States,* 445 U.S. 552, 556 (1980)); *see also United States v. Tucker,* 404 U.S. 443, 447 (1972); *Townsend v. Burke,* 334 U.S. 736, 741 (1948). To prevail on such a claim, the petitioner must show (1) that the information before the sentencing court was materially false, and (2) that the court relied on the false information in imposing the sentence. *Tucker*, 404 U.S. at 447; *United States v. Polselli*, 747 F.2d 356, 358 (6th Cir. 1984). *Koras,* 123 F. App'x at 213 (quoting *United States v. Stevens,* 851 F.2d 140, 143 (6th Cir. 1988)). A sentencing court demonstrates actual reliance on misinformation when the court gives "explicit attention" to it, "found[s]" its sentence "at least in part" on it, or gives "specific consideration" to the information before imposing sentence. *Tucker*, 404 U.S. at 444, 447.

Here, Petitioner does not argue that the trial court considered evidence that was materially false or based his sentence on false information. Instead, he objects to the use of evidence from outside the record of his own trial, and he objects to the weight the sentencing court accorded that evidence. As previously discussed, Petitioner's disagreement with the court's factual findings at sentencing does not rise to the level of a due-process violation. *Doyle*, 347 F. Supp. 2d at 485. Moroever, as the Supreme Court repeatedly has stated:

> judges exercise their sentencing discretion through 'an inquiry broad in scope, largely unlimited either as to the kind of information [they] may consider, or the source from which it may come.' . . . The Court has recognized that this process is constitutional – and that the facts taken into consideration need not be alleged in the indictment, submitted to the jury, or proved beyond a reasonable doubt.

*Harris v. United States*, 536 U.S. 545, 558 (2002) (quoting *Tucker*, 404 U.S. at 446); *see also Williams v. New York*, 337 U.S. 241, 250-51 (1949) (stating that due process does not require sentencing judges to "abandon their age-old practice of seeking information from out-of-court sources to guide their judgment toward a more enlightened and just sentence"). As a result, the mere fact that the judge considered evidence from McBride's trial to score sentencing variables and to set the minimum sentence fails to implicate due process.

Petitioner's claim under the Confrontation Clause is equally unavailing. The Sixth Circuit repeatedly has recognized that, as long as the evidence "bears some minimal indicia of reliability, . . . [the] Confrontation Clause permits the admission of testimonial hearsay evidence at sentencing proceedings . . . ." *United States v. Paull*, 551 F.3d 516, 527 (6th Cir. 2009) (internal quotation marks omitted); *see also United States v. Stone*, 432 F.3d 651, 654 (6th Cir. 2005) (noting that "the confrontation clause does not apply in sentencing proceedings"). Evidence admitted at a

trial of a co-defendant unquestionably bears indicia of reliability. He therefore fails to demonstrate a violation of the Confrontation Clause.

For both reasons, the state courts' denial of Petitioner's eighth habeas ground constitute a reasonable application of established Supreme Court precedent.

2.    *Blakely violation*

In his ninth habeas ground, Petitioner alleges that the trial court judge violated his Sixth Amendment right to a trial by jury by using, to enhance his sentence, facts that had not been admitted by Petitioner or found by a jury beyond a reasonable doubt. Petitioner bases his argument on the United States Supreme Court's holding in *Blakely v. Washington*, 542 U.S. 296 (2004). *Blakely* concerned the State of Washington's determinate sentencing system, which allowed a trial judge to elevate the maximum sentence permitted by law on the basis of facts not found by the jury but by the judge. Applying the Washington mandatory sentencing guidelines, the trial judge found facts that increased the maximum sentence faced by the defendant. The Supreme Court held that this scheme offended the Sixth Amendment, because any fact that increases or enhances a penalty for the crime beyond the prescribed statutory maximum for the offense must be submitted to the jury and proven beyond a reasonable doubt. *Blakely,* 542 U.S. at 301 (citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

Unlike the State of Washington's determinate sentencing system, the State of Michigan has an indeterminate sentencing system in which the defendant is given a sentence with a minimum and a maximum term. The maximum sentence is not determined by the trial judge, but is set by law. *See People v. Drohan*, 715 N.W.2d 778, 789-91 (Mich. 2006) (citing MICH. COMP. LAWS § 769.8). Only the minimum sentence is based on the applicable sentencing guideline range.

*Id.*; *and see People v. Babcock*, 666 N.W.2d 231, 236 n.7 (Mich. 2003) (citing MICH. COMP. LAWS § 769.34(2)). The Sixth Circuit authoritatively has held that the Michigan indeterminate sentencing system does not run afoul of *Blakely*. *See Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th Cir. Nov. 10, 2009) (affirming district court's dismissal of prisoner's claim under *Blakely* because it does not apply to Michigan's indeterminate sentencing scheme); *Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007). Therefore, the state court's determination of Petitioner's *Blakely* claim was not contrary to federal law clearly established by the United States Supreme Court.

### J.      Ineffective Assistance of Counsel

Throughout his petition, Petitioner raises the ineffective assistance of trial and appellate counsel as cause excusing his failure to properly preserve his claims at trial or present his claims on direct review. As previously discussed, Petitioner's habeas grounds were not considered to be procedurally defaulted. Instead, each of Petitioner's claims has been fully addressed on the merits. As a result, the court need not address Petitioner's allegations of ineffective assistance of trial and appellate counsel because they do not form an independent basis for habeas relief.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Date:  February 9, 2011                              /s/ Ellen S. Carmody
                                                     ELLEN S. CARMODY
                                                     United States Magistrate Judge

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).